BOOTH BROADCASTING COMPANY *v.* AMERICAN
FEDERATION OF TELEVISION AND
RADIO ARTISTS.

1. LABOR RELATIONS—NUMBER OF EMPLOYEES—ASSIGNMENT OF TASKS—COLLECTIVE BARGAINING.

The right to determine the actual number of persons to be employed and the distribution of job tasks to employees, while resting finally in management, are also proper subjects of collective bargaining under the national labor relations act (29 USC [1958 ed], § 157).

2. SAME—BROADCASTERS—FEATHERBEDDING.

Management's final right ·to determine the number of persons to be employed and the distribution of job tasks to employees

REFERENCES FOR POINTS IN HEADNOTES
[1] 31 Am Jur, Labor § 266.
Construction and application of National Labor Relations Act. 112 ALR 959, 115 ALR 314, 123 ALR 612.
Subjects of mandatory collective bargaining under Federal Labor Relations Act. 12 ALR2d 265.
[2] 31 Am Jur, Labor § 262.
What amounts to "collective bargaining" within National Labor Relations Act. 147 ALR 7.
[3] 31 Am Jur, Labor § 261.
Construction and effect of featherbedding provision of labor relations statute. 31 ALR2d 508.
[4] 35 Am Jur, Master and Servant § 62 *et seq.*
[5] 30A Am Jur, Judgments § 16 *et seq.*
[6] 31 Am Jur, Labor §§ 211–213.

does not empower it to arbitrarily shut off discussion of the question and then allege that employees who strike in protest to such action by the licensed employer brodcaster are in violation of Federal act prohibiting the use of force or other means to coerce such a licensee to employ anyone in excess of the number of employees needed by the licensee to perform actual services (47 USC [1958 ed], § 506).

**3.** SAME—NATIONAL LABOR RELATIONS ACT—FEATHERBEDDING.

The national labor relations act limits its condemnation of featherbedding to instances where a labor organization or its agents exact pay from an employer in return for services not performed or not to be performed (29 USC [1958 ed], § 158).

**4.** SAME—COMPENSATION OF EMPLOYEES.

The employee's compensation reflects his entire relationship with his employer, in the absence of proof to the contrary.

**5.** JUDGMENT—PLEADING—EVIDENCE—JURISDICTION.

The allegations in a civil action must be proved in a proper forum in order to have an enforceable judgment.

**6.** LABOR RELATIONS—INJUNCTION—INTERSTATE COMMERCE—BROADCASTERS—ANNOUNCERS.

The national labor relations board, not a State court, has jurisdiction to determine the number of employees a radio broadcaster which is engaged in interstate commerce needs in the performance of its functions, the determination of such question being a proper labor objective, hence, an injunction forbidding union representing the announcers from striking plaintiff's place of business and inducing advertisers not to do business with the broadcaster was not within the jurisdiction of the court to issue (29 USC [1958 ed], § 158; 47 USC [1958 ed], § 506).

Appeal from Wayne; Piggins (Edward S.), J. Submitted October 13, 1961. (Docket No. 74, Calendar No. 49,060.) Decided May 18, 1962.

Bill by Booth Broadcasting Company, a Michigan corporation, against American Federation of Television and Radio Artists (Detroit Local), a branch of the Associated Actors and Artists of America, AFL-CIO, and certain of its officials to enjoin picketing and interference with business practices. Tem-

porary injunction issued.  Defendants appeal.  Reversed and remanded for dismissal of bill.

*Long, Ryan, Grylls, Franseth & Spicer (Paul Franseth* and *R. Gerveys Grylls,* of counsel), for plaintiff.

*Schwartz, O'Hare, Sweeney & Sullivan (Rolland R. O'Hare* and *Boaz Siegel,* of counsel), for defendants.

KAVANAGH, J.  Plaintiff is the owner and operator of a radio station in the city of Detroit.  It is admitted plaintiff is engaged in interstate commerce. Defendant Detroit Local of the American Federation of Television and Radio Artists is a branch of the Associated Actors and Artists of America, affiliated with AFL-CIO, and for a number of years has been the collective bargaining representative for the staff announcers at plaintiff's station.

For some time prior to the expiration of their bargaining agreement on October 31, 1960, the parties had exchanged proposals relating to a number of matters concerning wages, hours, and other terms and conditions of employment of the staff announcers employed by the company.  State and Federal mediators attempted to bring the parties to agreement without success.

The company in the course of negotiations notified the union that because of certain changes in operation resulting from the use of automatic machinery the number of employees needed to perform the duties of announcers would be reduced.  The union in its proposals took the position that the full complement of announcers should remain employed by the company.  From this point on, the negotiations revolved around new methods of operations intended to be placed in effect by the company, the services which

the company proposed should be performed by members of the bargaining unit under the changed conditions, the number of men required to perform those services, the hours within which the men were to perform the services and criteria upon which the remuneration would be based.

The company took the position that certain functions previously performed by staff announcers would be performed by independent contractors who were outside the bargaining unit and were unorganized. The union insisted the staff announcers should continue to perform all services they had previously performed which had not been eliminated by the installation of automatic equipment. It offered to permit the announcers to perform such mechanical duties as they had the time and capacity to perform.

No agreement having been reached by the termination date of the collective bargaining agreement, and the company having notified certain announcers their services would no longer be required, the union struck.

In addition to establishing a picket line, the union sent out letters, distributed circulars, and contacted advertiser-customers of the company and others, both in person and by telephone, informing them of the strike and soliciting their support.

The picketing admittedly had been orderly and peaceful and nonstriking employees of the company had entered and left the building throughout the period of maintenance of the picket line.

The company filed with the national labor relations board a charge against defendants of an unfair labor practice under section 8(b) (6), which reads as follows:

"It shall be an unfair labor practice for a labor organization or its agents— * * * (6) to cause or attempt to cause an employer to pay or deliver

or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed." 29 USC (1958 ed), § 158.

Just prior to filing the bill of complaint in this case, plaintiff withdrew the unfair labor practice complaint before the board.

Defendants in November, 1960, filed a charge of unfair labor practices against the company. This charge or an amendment thereto is still pending and undisposed of before the national labor relations board as far as this record is concerned.

Subsequent to the withdrawal of its complaint with the national labor relations board, the company filed a bill of complaint in the Wayne county circuit court on November 18, 1960, seeking an injunction and alleging the object of the strike was to force plaintiff to employ unnecessary employees in violation of the communications act of 1934 (48 Stat 1064, 1101, as amended April 16, 1946, by the Lea act [60 Stat 89 (47 USC [1958 ed], § 506)]), which provides:

"Sec. 506.  (a) It shall be unlawful, by the use or express or implied threat of the use of force, violence, intimidation, or duress, or by the use or express or implied threat of the use of other means, to coerce, compel or constrain or attempt to coerce, compel, or constrain a licensee—(1) to employ or agree to employ, in connection with the conduct of the broadcasting business of such licensee, any person or persons in excess of the number of employees needed by such licensee to perform actual services."

The lower court first issued an *ex parte* restraining order.  At the show cause hearing, at which no testimony was taken but oral arguments were presented, the chancellor issued a temporary restraining order enjoining defendants in the following terms:

"1. from use of implied threat of the use of force, violence, intimidation or duress, or use of express or implied threat of the use of other means, to cause, compel or constrain, or attempt to cause, compel or constrain the plaintiff to employ or agree to employ in connection with the conduct of plaintiff's broadcasting business, any person in excess of the number of employees needed by plaintiff to perform actual services in said business;

"2. from picketing or threatening to picket for said unlawful purpose plaintiff's place of business, or any place where plaintiff is carrying on its business of broadcasting;

"3. from unlawfully intimidating, coercing, threatening or in any manner inducing customers, advertisers, independent contractors, or their employees and representatives, from doing business with or breaching their contracts with plaintiff, or in any manner inducing or trying to induce persons not to do business with the plaintiff for said purpose;

"4. from any act or conduct which may tend to the achievement of said unlawful objective."

Defendants sought leave from this Court to appeal the order granting the temporary injunction presenting the following questions:

1. Did the State court have jurisdiction to enter the injunction?

2. Was the court justified in presuming violation of the Lea act on the unresolved allegation of one party that it was being pressured to employ persons in excess of the number needed?

3. Assuming jurisdiction and that the Lea act required acceptance of one party's allegations as to employees needed, did the injunction violate defendants' rights under the First Amendment to the Federal Constitution?

We granted leave to appeal and stay of the temporary injunction. We further ordered the cause remanded to the trial court for a testimonial record

on the issues as framed at the show cause hearing. A record was subsequently made and filed with this Court. Briefs and oral arguments were presented by the respective parties.

It is the position of plaintiff that a State court has jurisdiction to enjoin striking, picketing, and soliciting plaintiff's customers to refrain from doing business with plaintiff, where such acts were for the purpose of coercing a company into employing more announcers than it needed to perform actual services, contrary to the provisions of the Lea act. Plaintiff further contends such acts constitute an unlawful labor objective which is not covered by the national labor relations act either under section 7 or section 8(b) (6).

Section 7 provides as follows:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 USC (1958 ed), § 157.

The argument of plaintiff with reference to section 7 is that this section speaks of a lawful labor dispute and since the activities of the union are in violation of the Lea act, the labor objective is unlawful and section 7 does not apply. Plaintiff contends that under section 8(b) (6) of the national labor relations act, congress dealt only with demands in the "nature of an exaction." Plaintiff asserts for a union to demand that a person be employed in excess of the number needed to perform actual services is a violation of the Lea act and was not included in section 8(b) (6) of the national labor relations act as amended by the Taft-Hartley act (29 USC [1958 ed], § 158).

Defendants, on the other hand, argue that the jurisdiction of the State court over the subject matter of the case has been pre-empted by the Federal scheme for regulating labor-management relations in industry affecting interstate commerce.

It is contended by defendants that *San Diego Building Trades Council* v. *Garmon,* 359 US 236 (79 S Ct 773, 3 L ed 2d 775) supports their position. In *Garmon,* defendants contend the rule was established that when an activity is arguably within the protection of section 7 or prohibited by section 8 of the national labor relations act, the States as well as the Federal courts must defer to the exclusive competence of the national labor relations board if the danger of State interference with national policy is to be averted.

In *Smith* v. *Evening News Association,* 362 Mich 350, this Court discussed at length the effect of *Garmon* concerning jurisdiction of a State court in labor matters.

The sole question for determination by this Court in the instant case is whether or not the challenged conduct is arguably within the protection of section 7 or prohibited under section 8(b) (6) of the national labor relations act.

The Lea act, sometimes called the Petrillo act, was aimed at certain practices encouraged by the musicians union which congress believed should be prohibited as "featherbedding."

It would appear from a reading of the record that what the union did in the instant case was to inform the company the union desired the company to continue to employ the same number of staff announcers as had been employed up to that time. The company's response made clear it did not intend to continue to employ the same number of staff announcers. The question at that point became how the duties under the newly-automated system were

to be distributed, what the work load of the people employed by the company would be, and how many announcers were needed to perform the duties, whether they were announcer duties or otherwise.

It is true the company asserted it had the sole and exclusive right to apportion duties among the several classes of employees. The record also shows the union attempted to convince the company that certain duties which it intended to assign to other employees should be assigned to announcers. The union further contended the announcers would be busy full time carrying out their duties.

The trial court appears to have reached the conclusion it was the exclusive prerogative of management to determine the number of men required to perform services.

Justice Black, speaking for the United States Supreme court in *United States* v. *Petrillo,* 332 US 1, 6 (67 S Ct 1538, 91 L ed 1877), a criminal case under the Lea act, in similar circumstances said:

"Certainly, an employer's statements as to the number of employees 'needed' is not conclusive as to that question."

There are a large number of factors that should be considered in determining whether a particular number of employees is needed to perform services.

Mr. Justice Reed, writing a dissenting opinion in the *Petrillo Case,* joined by Justices Murphy and Rutledge, said (p 17):

"How can a man or a jury possibly know how many men are 'needed' 'to perform actual services' in broadcasting? What must the quality of the program be? How skillful are the employees in the performance of their task? Does one weigh the capacity of the employee or the managerial ability of the employer? Is the desirability of short hours to spread the work to be evaluated? Or is the stand-

ard the advantage in take-home pay for overtime work?"

While management does have the final right to determine the actual number of persons to be employed and the distribution of job tasks to employees, such questions are proper subjects of collective bargaining under the national labor relations act. Management cannot arbitrarily shut off discussion of the question and then allege that employees who strike are in violation of the Lea act.

The intention of the sponsors of the Taft-Hartley bill to avoid the controversial features of the Lea act is made clear in the written statement which Senator Taft, co-sponsor of the bill and chairman of the senate committee on labor and public welfare, caused to be incorporated in the proceedings of the senate, June 5, 1947. Referring to the substitution of section 8(b) (6) in place of the detailed featherbedding provisions of the House bill, that statement said:

"The provisions in the Lea act from which the house language was taken are now awaiting determination by the supreme court, partly because of the problem arising from the term 'in excess of the number of employees reasonably required.' Therefore, the conferees were of the opinion that general legislation on the subject of featherbedding was not warranted at least until the joint study committee proposed by this bill could give full consideration to the matter." 93 Congressional Record 6443.

On the same day this was amplified in the following statement by Senator Taft on the floor of the Senate:

"There is one further provision which may possibly be of interest, which was not in the senate bill. The house had rather elaborate provisions prohibiting so-callled featherbedding practices and making

them unlawful labor practices. The senate conferees, while not approving of featherbedding practices, felt that it was impracticable to give to a board or a court the power to say that so many men are all right, and so many men are too many. It would require a practical application of the law by the courts in hundreds of different industries, and a determination of facts which it seemed to me would be almost impossible. So we declined to adopt the provisions which are now in the Petrillo act. After all, that statute applies to only 1 industry. Those provisions are now the subject of court procedure. Their constitutionality has been questioned. We thought that probably we had better wait and see what happened, in any event, even though we are in favor of prohibiting all featherbedding practices. However, we did accept 1 provision which makes it an unlawful labor practice for a union to accept money for people who do not work. That seemed to be a fairly clear case, easy to determine, and we accepted that additional unfair labor practice on the part of unions, which was not in the senate bill." 93 Congressional Record 6441. See, also, his supplementary analysis inserted in the Record June 12, 1947. 93 Congressional Record 6859.

The national labor relations act now limits its condemnation of featherbedding to instances where a labor organization or its agents exact pay from an employer in return for services not performed or not to be performed. Thus, where work is done by an employee, with the employer's consent, a labor organization's demand that the employee be compensated for time spent in doing the disputed work does not become an unfair labor practice. The transaction simply does not fall within the kind of featherbedding defined in the statute. In the absence of proof to the contrary, the employee's compensation reflects his entire relationship with his employer.

We do not have here a situation comparable to that mentioned by Senator Taft as an illustration of the type of featherbedding which he would consider an unfair labor practice within the meaning of section 8(b) (6). On June 5, 1947, in a colloquy on the floor of the Senate, he said in reference to section 8(b) (6):

"It seems to me that it is perfectly clear what is intended. It is intended to make it an unfair labor practice for a man to say, 'You must have 10 musicians, and if you insist that there is room for only 6, you must pay for the other 4 anyway.' That is in the nature of an exaction from the employer for services which he does not want, does not need, and is not even willing to accept." 93 Congressional Record 6446.

In the case before us it has not been proven defendants were in violation of the Lea act. No criminal charge has been filed. The allegations in a civil action must be proved. This must be done in the proper forum.

It is certainly arguable the union was not negotiating to force the company to employ persons in excess of the number of employees reasonably required, neither was it negotiating for pay to employees for "stand-by services"—the nonperformance of services. It is the union's position the number of announcers that would reasonably be required was the number it was seeking.

Plaintiff relies upon 2 cases in support of its position concerning section 8(b) (6) of the national labor relations act. One case was *American Newspaper Publishers Association* v. *National Labor Relations Board,* 345 US 100 (73 S Ct 552, 97 L ed 852, 31 ALR2d 497), where the United States supreme court held the language and legislative history of section 8(b) (6) support the conclusion that the labor organization's insistence upon securing

payment of wages to printers for "setting bogus" is not an unfair labor practice within the meaning of the section. The court went on to hold that the featherbedding practices under the national labor relations act were now limited to instances where a labor organization or its agents exact pay from an employer for services not performed or not to be performed. In the setting of bogus type the work was actually performed and, therefore, the court held it was not an unfair labor practice within the meaning of section 8(b) (6). Justice Burton in the majority opinion said (p 111):

"Section 8(b) (6) leaves to collective bargaining the determination of what, if any, work, including bona fide 'made work,' shall be included as compensable services and what rate of compensation shall be paid for it."

The other case relied upon by plaintiff is the case of *National Labor Relations Board* v. *Gamble Enterprises, Inc.,* 345 US 117 (73 S Ct 560, 97 L ed 864). There the court held a labor organization does not engage in an unfair labor practice within the meaning of section 8(b) (6) of the national labor relations act when it insists that the management of one of an interstate chain of theaters shall employ a local orchestra to play in connection with certain programs, although that management does not need or want to employ that orchestra. The court said (p 123):

"We accept the finding of the board, made upon the entire record, that the union was seeking actual employment for its members and not mere 'stand-by' pay. * * * It (the union) has, however, requested and consistently negotiated for actual employment in connection with traveling band and vaudeville appearances. It has suggested various ways in which a local orchestra could earn pay for performing competent work and, upon those terms, it has offered to consent to the appearance of traveling

bands which are federation-controlled. Respondent, with equal consistency, has declined these offers as it had a right to do.

"Since we and the board treat the union's proposals as in good faith contemplating the performance of actual services, we agree that the union has not, on this record, engaged in a practice proscribed by section 8(b) (6)."

The court then went on to say (pp 123, 124):

"The proposals before us were appropriately treated by the board as offers in good faith of substantial performances by competent musicians. * * * When an employer receives a bona fide offer of competent performance of relevant services, it remains for the employer, through free and fair negotiation, to determine whether such offer shall be accepted and what compensation shall be paid for the work done."

Although in the instant case upon a complete record it might be determined by the competent administrative agency that the union had engaged in an unfair labor practice prohibited by section 8(b) (6) of the national labor relations act, this determination should and must be made by the administrative agency provided by congress in its legislation. A petition for this purpose was and is on file with that agency. Since it is arguably an activity within the protection of section 7 or arguably an activity prohibited by section 8(b) (6) of the national labor relations act, under *San Diego Building Trades Council* v. *Garmon, supra,* the State court had no jurisdiction in the matter.

The case of *General Teleradio, Inc.,* v. *Manuti,* 284 App Div 400 (131 NYS2d 365), relied upon by plaintiff was a decision handed down prior to the second *Garmon Case* in 359 US 236 (77 S Ct 773, 3 L ed 2d 775), and, therefore, no longer applicable.

The order entering the interlocutory injunction

issued by the court below is reversed and the case is remanded for entry of an order dismissing plaintiff's bill of complaint. Defendants shall have costs.

CARR, C. J., and DETHMERS, KELLY, BLACK, SOURIS, and OTIS M. SMITH, JJ., concurred.

ADAMS, J., took no part in the decision of this case.