[Civ. No. 248. Fifth Dist. May 23, 1963.]

BRICKLAYERS AND MASONS UNION NO. 1 OF CALI-
FORNIA et al., Petitioners, v. THE SUPERIOR COURT
OF KINGS COUNTY, Respondent; WINSOR CURTIS,
Real Party in Interest.

Stutsman, Nagel & Ferrari, Brundage, Hackler & Roseman, Charles K. Hackler and Julius Reich for Petitioners.

No appearance for respondent.

Earl Klein for Real Party in Interest.

CONLEY, P. J.—Bricklayers and Masons Union No. 1 of California and Bricklayers, Masons and Plasterers International Union of America and their officers and members seek a writ of prohibition to prevent further proceedings in a damage suit against them now pending in the Superior Court of Kings County; the application is based on the contention that that court lacks jurisdiction because the acts complained of in the suit are arguably protected or prohibited conduct under the National Labor Relations Act and exclusive jurisdiction over the cause rests in the National Labor Relations Board. (*San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236 [79 S.Ct. 773, 3 L.Ed.2d 775].)

The superior court action which the petitioners seek to halt (*Winsor Curtis, Plaintiff* v. *Bricklayers and Masons Union No. 1 of California et al., Defendants*) was filed in Kings County and is numbered 15043 therein. In that case Winsor Curtis, an individual doing business under the fictitious name of Birdor Masonry Contractors, sued the petitioners herein for damages claimed to have been caused through the commission of a tort, to wit, interference with economic relations. In the suit it was alleged that on or about May 17, 1960, plaintiff and the defendant unions entered into a collective

bargaining agreement in writing under which the unions agreed to provide adequately trained and qualified workmen for masonry and brick work in connection with the construction by Mr. Curtis of several hundred homes at the Lemoore Naval Air Station in Kings County. The construction in question was part of a Capehart housing project, and the residences were to be used by naval personnel. The total amount of plaintiff's bid for this job was $360,000, and in the year 1960 plaintiff's gross business was approximately $1,400,000. The contract which plaintiff made for the construction in question was entered into on or about November 27, 1959.

The written contract between plaintiff and the unions did not mention the use of a device which a union representative and plaintiff orally agreed might be employed by the workmen. This device, known as a "speed lead," was originated and perfected to replace the plumb rule, and it facilitated bricklaying by securing an accurate and level course for the laying of the bricks. Plaintiff alleges that he expended the sum of $2,500 in perfecting this "speed lead," because the use of the device improved the quality of the construction and permitted workmen to accomplish their end and aim at a more rapid pace. Plaintiff alleged that with the use of the "speed lead" each workman could lay an average of 430 bricks a day and that with that average the brick work at the Lemoore Naval Air Station would have required 1,800 shifts to complete. For approximately three months the "speed lead" was used with such average production. It is further alleged that on or about the 1st of August 1960, one Al Bishop, a member of the defendant unions and a bricklayer on the housing project, was discharged by plaintiff because of inefficiency in the quantity and quality of his work. The unions protested, and Mr. Bishop was rehired, but with no indication of improvement in his work, he was again discharged on August 11, 1960. On the following morning the dispute again flared up between the plaintiff and the unions, and a meeting of its members was called by the defendant Lopez, the secretary and business agent of the California union, for the purpose of voting on a discontinuance of the "speed lead." On August 19, the plaintiff received a letter from Mr. Lopez mailed on behalf of the unions stating that on August 17, 1960, the unions had voted to outlaw the use of the device, and plaintiff's workmen were forbidden to use the

"speed lead"; they in fact ceased to use it. It is alleged "That said action in outlawing the use of the 'speed lead' and forbidding Plaintiff's employees from using the 'speed lead' was taken maliciously, deliberately and wilfully by the defendants with the sole purpose, aim and objective to injure Plaintiff and slow down production on the housing project at Lemoore Naval Air Station because Plaintiff had discharged the above mentioned defendant, Al Bishop." The plaintiff continues by stating that the defendants conspired among themselves "to maliciously, wilfully and deliberately inflict financial loss upon Plaintiff and his business in retribution for the discharge of the said defendant, Al Bishop." The plaintiff further avers that by the abolition of the "speed lead" plaintiff was required to use 2,062 shifts to complete the housing project or 262 more shifts than would have been required if the "speed lead" had been used, at an additional cost to plaintiff of $14,410. It is further claimed that by their refusal to use it, plaintiff's employees destroyed the value of the "speed lead" which was developed and created for the particular job; it is further said that other masonry contractors operating in the territorial jurisdiction of the defendant unions were permitted to use devices of a similar type to replace the plumb rule. The additional allegation is made that because of the slowdown the governmental authorities at the naval air station decided never to use additional brick work in future construction projects at the naval air station. The prayer is for $16,910 loss of profits, $30,000 for loss of prospective profits and $500,000 punitive and exemplary damages besides costs of suit.

The petition for a writ of prohibition alleges that the petitioners filed a motion for summary judgment in the action on or about the 19th of February 1962, and therein objected to the suit on the ground that the court lacked jurisdiction. After hearing, the motion was denied, and the case was set down for trial; the petition avers that it will be tried and judgment rendered unless the writ of prohibition is granted.

It is alleged: "Respondent has no jurisdiction in said matter, for the reason that the facts of the case reveal that the conduct of the Defendants, Petitioners herein, constitute arguably protected or prohibited conduct under the National Labor Relations Act and exclusive jurisdiction over the cause rests in the National Labor Relations Board."

It is elementary that this court has jurisdiction to issue

a writ of prohibition to prevent the superior court from acting in excess of its jurisdiction. (Cal. Const., art. VI, § 4b; Code Civ. Proc., §§ 1102, 1103; *Harden* v. *Superior Court,* 44 Cal.2d 630, 634 [284 P.2d 9]; *Calise* v. *Superior Court,* 159 Cal.App.2d 126, 132, 135 [323 P.2d 859].) Petitioners contend that this is the only means by which defendants can have the holding of the superior court reviewed without the necessity of a trial. ■ There is, of course, no appeal from an order denying a summary judgment. (*Stanton* v. *Andrews,* 170 Cal.App.2d 269 [338 P.2d 529]; *Schulze* v. *Schulze,* 121 Cal.App.2d 75 [262 P.2d 646]; *Nevada Constructors, Inc.* v. *Mariposa Public Utility Dist.,* 114 Cal.App.2d 816 [251 P.2d 53].) The trial was anticipated to last six days; some of the defendants would attend with the greatest inconvenience, and the requirement of a trial in which many of the witnesses depend for their livelihood on daily wages would be extremely burdensome. ■ As is said in *Phelan* v. *Superior Court,* 35 Cal.2d 363, 370 [217 P.2d 951]: "Where an order is not appealable, but is reviewable only upon appeal from a subsequent judgment, various factors, such as expense of proceeding with a trial and prejudice resulting from delay, may operate to make that remedy inadequate."

It is observed in 3 Witkin, California Procedure, Extraordinary Writs, section 36, pages 2510-2511: "... the expense and delay of a substantial trial or hearing will usually be a sufficient reason for prohibition."

In view of all of the circumstances, we hold that a determination of the jurisdiction of the superior court through this application for a writ of prohibition is justified.

Petitioners' basic premise in support of their request for relief is that the California courts have no jurisdiction to try a case which is arguably either a protected or prohibited activity under the National Labor Relations Act, because Congress has indicated an intent to vest exclusive jurisdiction with respect to matters of that kind in the National Labor Relations Board. ■ In the area of labor relations it is clearly apparent from the volume and comprehensiveness of federal legislation that the doctrine of preemption applies, and Congress has indicated that concurrent jurisdiction should not be effectuated except where expressly provided for and that any state law which conflicts with national legislation must yield to the federal statutes. In enacting the National

Labor Relations Act, 49 Statutes 451, 29 United States Code Annotated section 153 and following, Congress created an administrative board with investigative, hearing and decisional powers as well as authority to apply to the courts for intermediate injunctive relief; the fundamental purpose of the National Labor Relations Board is to administer the operation of the act. Because Congress intended that there should be a single uniform policy throughout the land in the area of labor relations, both state and federal courts are barred from interfering with the primary jurisdiction of the National Labor Relations Board (*San Diego Bldg. Trades Council* v. *Garmon, supra*, 359 U.S. 236, 245 [79 S.Ct. 773, 3 L.Ed.2d 775, 783]; *Ex parte George*, 371 U.S. 72 [83 S.Ct. 178, 9 L.Ed.2d 133].)

In the *Garmon* case, *supra*, at page 780 [359 U.S. at pp. 245-247 (3 L.Ed.2d at pp. 783-784)], the Supreme Court said: "When an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

" . . . . . . . . . . . . . . . .

"Since the National Labor Relations Board has not adjudicated the status of the conduct for which the State of California seeks to give a remedy in damages, and since such activity is arguably within the compass of § 7 or § 8 of the Act, the State's jurisdiction is displaced.

"Nor is it significant that California asserted its power to give damages rather than to enjoin what the Board may restrain, though it could not compensate. Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered.

"Such regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."

Petitioners argue that further evidence that the N.L.R.B. has exclusive competence in this field is supported by a 1959 amendment to the act, 73 Statutes 541. Section 14(c)(2), 29 United States Code Annotated section 164(c) (2), now reads as follows: "Nothing in this subchapter shall be deemed to prevent or bar any agency or the courts of any

State or Territory . . . from assuming and asserting jurisdiction over labor disputes over which the Board declines . . . to assert jurisdiction.''

Section 14(c) (1) of the act, 29 United States Code Annotated section 164(c)(1), provides that the board may not decline to assert jurisdiction over ''any labor dispute'' over which it would have asserted jurisdiction under the standards prevailing on August 1, 1959. Petitioner contends that Congress has compellingly expressed its direction that the board make the initial determination of its own jurisdiction, either by rule or by decision in particular cases and that only after the board has declined to intervene in any matter within the area of its jurisdiction may the state courts or agencies proceed.

The question is always freshly presented, however, whether particular persons or activities fall within or without the periphery of national policy. It is often not easy to decide such questions, and courts are frequently divided when they are presented. (*Marine Engineers Beneficial Assn.* v. *Interlake Steamship Co.* (1962) 370 U.S. 173 [82 S.Ct. 1237, 8 L.Ed.2d 418] ; *Garner* v. *Teamsters, Chauffeurs & Helpers Local Union,* 346 U.S. 485 [74 S.Ct. 161, 165-166, 98 L.Ed. 228] ; *California Kitchens, Inc.* v. *United etc. Carpenters,* 139 Cal. App.2d 597, 602 [294 P.2d 468].)

However, it is not so difficult to decide whether specific conduct complained of is *arguably* either protected or prohibited, and if, as is pointed out in the *Garmon* case, *supra,* 359 U.S. 236, 245 [79 S.Ct. 773, 780, 3 L.Ed.2d 775, 783], such conduct is arguably protected or prohibited, the conclusion must be that the California courts have no jurisdiction to act in such suits, except to order a dismissal.

It is obvious under the authorities that the plaintiff is an employer whose activities affect commerce within the meaning of the National Labor Relations Act. In a 1959 case, *National Labor Relations Board* v. *F. M. Reeves & Sons, Inc.,* 273 F.2d 710, the employer contested the board's jurisdiction. Such employer furnished goods and services valued at $112,000 during one year to organizations performing work on the Walker Air Force Base, and it was held that these activities had sufficient impact to warrant the board's asserting jurisdiction. Similarly, in *Ready Mixed Concrete & Materials, Inc. & Local #669, Concrete Products & Material Yard Employees, Petitioner,* 122 N.L.R.B. 318, the furnishing of

$154,000 of ready mixed concrete to general contractors constructing a United States Air Force Base in South Carolina was considered by the board as a sufficiently substantial impact on national defense to furnish the ground for a takeover. In this case the Lemoore project was designed to provide housing for United States naval personnel. The total of supplies and services furnished by plaintiff to the project according to his bid was $360,000. On this facet of jurisdiction it seems quite clear that the board, upon timely application, would have accepted consideration of the controversy.

■ Is the conduct described in plaintiff's complaint arguably protected or arguably proscribed conduct under the terms of the National Labor Relations Act? We believe that it is.

With respect to proscribed conduct, section 8(b)(6), commonly referred to as the "anti-featherbedding" section, is arguably involved. Plaintiff alleges that the bricklaying at the Lemoore job would have been accomplished in 1,800 shifts if the "speed lead" had been used, but that it took 2,062 shifts to complete it, because defendants refused to employ that laborsaving device. In *Booth Broadcasting Co.* v. *American Federation of Television & Radio Artists,* 366 Mich. 559 [115 N.W.2d 380, 386], the company proposed to put in some automatic machinery to which the union objected; the union struck. Although the Michigan Supreme Court doubted that the union's activities would be considered a violation of section 8(b)(6), it concluded that: ". . . this determination should and must be made by the administrative agency provided by Congress in its legislation. . . . Since it is arguably an activity within the protection of section 7 or arguably an activity prohibited by section 8(b)(6) of the National Labor Relations Act, under *San Diego Bldg. Trades Council . . .* v. *Garmon, supra,* the State court had no jurisdiction in the matter."

Of course, the question here is not whether requiring an employer to use 262 more shifts of bricklaying than he would otherwise have used is a violation of the "anti-featherbedding" section, but whether this court must necessarily conclude that the determination of that question is one for the N.L.R.B. initially to decide.

Is not the conduct of defendants arguably protected activity? Attempts on the part of working men to restrict the use of laborsaving devices has been said to involve ". . . a lawful

labor objective, as it is an effort to maintain employment." (*Orange Belt Chapter Painting & Decorating Contractors Assn.* v. *Orange Belt Dist. Council of Painters,* 42 L.R.R.M. 2522, 2525.)

Our courts have held that normal, legitimate and lawful activities of a labor union include the calling or threatening of strikes against the use of laborsaving devices which will displace their members. (*United States* v. *Carrozzo,* 37 F.Supp. 191, 196, affirmed in *United States* v. *International Hod Carriers,* 313 U.S. 539 [61 S.Ct. 839, 85 L.Ed. 1508]; *United States* v. *Bay Area Painters & Decorators Joint Committee, Inc.,* 49 F.Supp. 733; *United States* v. *American Federation of Musicians,* 47 F.Supp. 304, affirmed in 318 U.S. 741 [63 S.Ct. 665, 87 L.Ed. 1120]; *Booth Broadcasting Co.* v. *American Federation of Television & Radio Artists, supra,* 366 Mich. 559 [115 N.W.2d 380].)

Petitioners contend that section 7 of the National Labor Relations Act authorizes the defendants to act as they did because they were engaging in concerted activity for the purpose of their "mutual aid or protection." *United States* v. *American Federation of Musicians, supra,* 47 F.Supp. 304, interpreted section 13(c) of the Norris-LaGuardia Act, 29 United States Code Annotated section 113(c); there the union was attempting to prevent employers from using mechanical methods which would reduce the demand for labor, and the court said it was "satisfied that the union and its members and the employers" were "disputing in respect of 'a condition of employment.'" In *National Labor Relations Board* v. *Washington Aluminum Co.* (1962) 370 U.S. 9 [82 S.Ct. 1099, 8 L.Ed.2d 298], the board had found that an employer had violated section 8(a)(1) of the act by discharging seven employees who had walked out in protest over lack of heating in their place of employment; the Supreme Court concluded that the workers in protesting this condition of employment were "engaging in concerted activities which section 7 of the tion of employment.'" In *National Labor Relations Board* v. *John S. Swift Co.,* 277 F.2d 641; *National Labor Relations Board* v. *Knight Morley Corp.,* 251 F.2d 753; *National Labor Relations Board* v. *Southern Silk Mills,* 209 F.2d 155; *National Labor Relations Board* v. *J. I. Case Co.,* 198 F.2d 919.)

An employer who disciplines an employee for protesting the discharge of a fellow worker may be guilty of an unfair labor practice under section 8 (a) (1). (*National Labor Rela-*

*tions Board* v. *Mitchko, Inc.*, 284 F.2d 573, 576; *National Labor Relations Board* v. *McCatron*, 216 F.2d 212, 215; *National Labor Relations Board* v. *Globe Wireless, Ltd.*, 193 F.2d 748.)

In *National Labor Relations Board* v. *Peter Cailler Kohler Swiss Chocolates Co., Inc.*, 130 F.2d 503, 505, a union president was discharged because the union had passed a resolution castigating their employer for helping to break a strike. Judge Learned Hand upheld his reinstatement under federal law, finding that the adoption of the resolution had been a concerted activity for the purpose of mutual aid or protection: "When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a 'concerted activity' for 'mutual aid or protection,' although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each one of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established 'is mutual aid' in the most literal sense, as nobody doubts."

In the memorandum denying the motion for summary judgment the trial judge says: "Employees may not use the slow-down or work stoppages as means for labor objectives."

This statement is not in accord with congressional legislation; in 1947 Congress amended the National Labor Relations Act in numerous ways, including the enactment of the following expanded definition of "strike": "The term 'strike' includes any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any concerted slow-down or other concerted interruption of operations by employees." (29 U.S.C.A. § 142(2).)

The real party in interest answers the petition with two contentions: (1) that plaintiff's cause of action is based on a common law tort and does not deal with collective bargaining or concerted activity; and (2) that plaintiff's cause of action is not preempted by federal labor laws.

*United Construction Workers* v. *Laburnum Construction Corp.*, 347 U.S. 656 [74 S.Ct. 833, 98 L.Ed. 1025], and *International Union, U.A.A. & A.I.W.* v. *Russell*, 356 U.S. 634 [78 S.Ct. 932, 2 L.Ed.2d 1030], are cited in support of the argument for state jurisdiction made by the real party in

interest. However, it seems clear that these cases must be distinguished because the questioned activity included intimidation and violence. In the *Garmon* case, *supra,* the court stated in 79 S.Ct. at page 781 [359 U.S. 236, 247 (3 L.Ed.2d 775, 784)] : ''State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction.''

Speaking of the *Laburnum* case, *supra,* the court says: ''But that decision was determined, as is demonstrated by the question to which review was restricted, by the 'type of conduct' involved, i. e., 'intimidation and threats of violence.' ''

(See also *Fullerton* v. *International Sound Technicians,* 194 Cal.App.2d 801, 814-815 [15 Cal.Rptr. 451].)

It appears to us that the actions complained of on the part of the defendants are arguably prohibited or permitted under the National Labor Relations Act and that the prayer of the petition for a writ of prohibition must be granted. We foresee that there may be a long delay in, or even a total prevention of, a trial of the questions posed by the complaint. The condition of juridical and administrative stasis which will necessarily result is regrettable but remediless insofar as this court is concerned.

It is ordered that peremptory writ of prohibition issue forbidding and restraining respondent from any further proceedings in connection with or based upon the allegations or prayer in the complaint in action No. 15043 now pending in the Superior Court of the State of California for the County of Kings, except to grant a dismissal without prejudice of said action if a motion for such dismissal shall be made in due course by defendants in said action who are petitioners herein.

Brown (R.M.), J., and Stone, J., concurred.

The petition of the real party in interest for a hearing by the Supreme Court was denied July 17, 1963.