## NATIONAL LABOR RELATIONS BOARD *v.* GAMBLE ENTERPRISES, INC.

No. 238.  Argued November 19, 1952.—Decided March 9, 1953.

*Bernard Dunau* argued the cause for petitioner. With him on the brief were *Acting Solicitor General Stern, George J. Bott, David P. Findling* and *Mozart G. Ratner.*

*Frank C. Heath* argued the cause for respondent. With him on the brief was *H. Chapman Rose.*

*Henry Kaiser, Gerhard P. Van Arkel* and *Eugene Gressman* filed a brief for Local No. 24, American Federation of Musicians, as *amicus curiae,* supporting petitioner.

MR. JUSTICE BURTON delivered the opinion of the Court.

This case is a companion to *American Newspaper Publishers Assn.* v. *Labor Board, ante,* p. 100.

The question here is whether a labor organization engages in an unfair labor practice, within the meaning of § 8 (b) (6) of the National Labor Relations Act, as amended by the Labor Management Relations Act, 1947,[1] when it insists that the management of one of an interstate chain of theaters shall employ a local orchestra to play in connection with certain programs, although that management does not need or want to employ that orchestra. For the reasons hereafter stated, we hold that it does not.

While the circumstances differ from those in the preceding case, the interpretation there given to § 8 (b) (6) is controlling here.

---

[1] "SEC. 8. . . ..

.       .       .       .       .

"(b) It shall be an unfair labor practice for a labor organization or its agents—

.       .       .       .       .

"(6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed. . . ." 61 Stat. 140–142, 29 U. S. C. (Supp. V) § 158 (b) (6).

For generations professional musicians have faced a shortage in the local employment needed to yield them a livelihood. They have been confronted with the competition of military bands, traveling bands, foreign musicians on tour, local amateur organizations and, more recently, technological developments in reproduction and broadcasting. To help them conserve local sources of employment, they developed local protective societies. Since 1896, they also have organized and maintained on a national scale the American Federation of Musicians, affiliated with the American Federation of Labor. By 1943, practically all professional instrumental performers and conductors in the United States had joined the Federation, establishing a membership of over 200,000, with 10,000 more in Canada.[2]

The Federation uses its nationwide control of professional talent to help individual members and local unions. It insists that traveling band contracts be subject to its rules, laws and regulations. Article 18, § 4, of its By-Laws provides: "Traveling members cannot, without the consent of a Local, play any presentation performances in its jurisdiction unless a local house orchestra is also employed." [3]

From this background we turn to the instant case. For more than 12 years the Palace Theater in Akron, Ohio, has been one of an interstate chain of theaters managed by respondent, Gamble Enterprises, Inc., which is a Washington corporation with its principal office in New York. Before the decline of vaudeville and until about 1940, respondent employed a local orchestra of nine union musicians to play for stage acts at that theater. When a

---

[2] Countryman, The Organized Musicians, 16 U. of Chi. L. Rev. 56–85, 239–297.

[3] Article 18, § 3, provides: "Traveling members appearing in acts with vaudeville unit or presentation shows are not permitted to play for any other acts on the bill without consent of the Local."

traveling band occupied the stage, the local orchestra played from the pit for the vaudeville acts and, at times, augmented the performance of the traveling band.

Since 1940, respondent has used the Palace for showing motion pictures with occasional appearances of traveling bands. Between 1940 and 1947, the local musicians, no longer employed on a regular basis, held periodic rehearsals at the theater and were available when required. When a traveling band appeared there, respondent paid the members of the local orchestra a sum equal to the minimum union wages for a similar engagement but they played no music.

The Taft-Hartley Act, containing § 8 (b) (6), was passed, over the President's veto, June 23, 1947, and took effect August 22. Between July 2 and November 12, seven performances of traveling bands were presented on the Palace stage. Local musicians were neither used nor paid on those occasions. They raised no objections and made no demands for "stand-by" payments. However, in October, 1947, the American Federation of Musicians, Local No. 24 of Akron, Ohio, here called the union, opened negotiations with respondent for the latter's employment of a pit orchestra of local musicians whenever a traveling band performed on the stage. The pit orchestra was to play overtures, "intermissions" and "chasers" (the latter while patrons were leaving the theater). The union required acceptance of this proposal as a condition of its consent to local appearances of traveling bands. Respondent declined the offer and a traveling band scheduled to appear November 20 canceled its engagement on learning that the union had withheld its consent.

May 8, 1949, the union made a new proposal. It sought a guaranty that a local orchestra would be employed by respondent on some number of occasions having a relation to the number of traveling band appear-

ances.[4]   This and similar proposals were declined on the ground that the local orchestra was neither necessary nor desired.   Accordingly, in July, 1949, the union again declined to consent to the appearance of a traveling band desired by respondent and the band did not appear.   In December an arrangement was agreed upon locally for the employment of a local orchestra to play in connection with a vaudeville engagement on condition that the union would consent to a later traveling band appearance without a local orchestra.   Respondent's New York office disapproved the plan and the record before us discloses no further agreement.

In 1949, respondent filed charges with the National Labor Relations Board asserting that the union was engaging in the unfair labor practice defined in § 8 (b) (6). The Regional Director of the Board issued a complaint to that effect.   After a hearing the trial examiner found respondent to be engaged in interstate commerce and recommended that the Board assert jurisdiction.   92 N. L. R. B. 1528, 1538, 1540.   On the merits, he concluded that the union's conduct "was nothing more or less than a proposal for a stand-by engagement," but he was not convinced that the union's demands were an "attempt to cause" any payment to be made "in the nature of an *exaction*."   He, accordingly, recommended dismissal of the complaint.   *Id.,* at 1549, 1550, 1551. The Board unanimously agreed to assert jurisdiction. With one dissent, it also ordered dismissal of the com-

---

[4] The union suggested four plans.   Each called for actual playing of music by a local union orchestra in connection with the operation of the theater: (1) to play overtures, intermissions and chasers; (2) to play the music required for vaudeville acts not an integral part of a traveling band ensemble; (3) to perform on stage with vaudeville acts booked by respondent; or (4) to play at half of the total number of respondent's stage shows each year.

plaint, but it did so on grounds differing from those urged by the trial examiner. *Id.*, at 1528–1529. It said:

"On the contrary, the instant record shows that in seeking employment of a local orchestra, the . . . [union] insisted that such orchestra be permitted to play at times which would not conflict with the traveling bands' renditions. Thus, the record herein does not justify a finding that, during the period embraced by the charges herein, the . . . [union] was pursuing its old policy and was attempting to cause the charging party to make payments to local musicians for services which were not to be performed.

.　　　.　　　.　　　.　　　.

"In our opinion, Section 8 (b) (6) was not intended to reach cases where a labor organization seeks actual employment for its members, even in situations where the employer does not want, does not need, and is not willing to accept such services. Whether it is desirable that such objective should be made the subject of an unfair labor practice is a matter for further congressional action, but we believe that such objective is not proscribed by the limited provisions of Section 8 (b) (6).

"Upon the entire record in the case, we find that the . . . [union] has not been guilty of unfair labor practices within the meaning of Section 8 (b) (6) of the Act." *Id.*, at 1531, 1533–1534.

The Court of Appeals for the Sixth Circuit did not disturb the Board's finding that the union sought actual employment for its members, but it held, nevertheless, that the union was engaging in a labor practice declared unfair by § 8(b) (6). It, therefore, set aside the Board's order of dismissal and remanded the cause. 196 F. 2d 61. For reasons stated in the *American Newspaper* case, *ante*, p. 100, we granted certiorari. 344 U. S. 814. We denied

the union's motion to intervene, 344 U. S. 872, but, with the consent of the parties, it filed a brief as *amicus curiae,* supporting the Board.

We accept the finding of the Board, made upon the entire record, that the union was seeking actual employment for its members and not mere "stand-by" pay. The Board recognized that, formerly, before § 8 (b)(6) had taken effect, the union had received "stand-by" payments in connection with traveling band appearances. Since then, the union has requested no such payments and has received none. It has, however, requested and consistently negotiated for actual employment in connection with traveling band and vaudeville appearances. It has suggested various ways in which a local orchestra could earn pay for performing competent work and, upon those terms, it has offered to consent to the appearance of traveling bands which are Federation-controlled. Respondent, with equal consistency, has declined these offers as it had a right to do.

Since we and the Board treat the union's proposals as in good faith contemplating the performance of actual services, we agree that the union has not, on this record, engaged in a practice proscribed by § 8 (b)(6). It has remained for respondent to accept or reject the union's offers on their merits in the light of all material circumstances. We do not find it necessary to determine also whether such offers were "in the nature of an exaction." We are not dealing here with offers of mere "token" or nominal services. The proposals before us were appropriately treated by the Board as offers in good faith of substantial performances by competent musicians. There is no reason to think that sham can be substituted for substance under § 8 (b)(6) any more than under any other statute. Payments for "standing-by," or for the substantial equivalent of "standing-by," are not payments for services performed, but when an employer receives a

bona fide offer of competent performance of relevant services, it remains for the employer, through free and fair negotiation, to determine whether such offer shall be accepted and what compensation shall be paid for the work done.[5]

The judgment of the Court of Appeals, accordingly, is reversed and the cause is remanded to it.

*Reversed and remanded.*

MR. JUSTICE JACKSON, dissenting.

The economic advantages or abuses that result from "featherbedding" admittedly are not our concern. But I cannot escape the conclusion that the facts of this case bring it within the statute which makes it an "unfair labor practice" for a labor organization or its agents "to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed. . . ." 61 Stat.

---

[5] In addition to the legislative history cited in the *American Newspaper* case, the following explanation by Senator Ball emphasizes the point that § 8 (b) (6) proscribes *only* payments where *no work is done*. As a member of the Senate Committee on Labor and Public Welfare, and as one who had served as a Senate conferee, he made it on the floor of the Senate immediately preceding the passage of the bill, over the President's veto, June 23, 1947:

"There is not a word in that [§ 8 (b) (6)], Mr. President, about 'featherbedding.' It says that it is an unfair practice for a union to force an employer to pay for *work which is not performed*. In the colloquy on this floor between the Senator from Florida [Mr. Pepper] and the Senator from Ohio [Mr. Taft], before the bill was passed, it was made abundantly clear that it did not apply to rest periods, it did not apply to speed-ups or safety provisions, or to anything of that nature; it applied *only* to situations, for instance, where the Musicians' Federation forces an employer to hire one orchestra and then to pay for another *stand-by orchestra, which does no work at all*." (Emphasis supplied.) 93 Cong. Rec. 7529.

140–142, 29 U. S. C. (Supp. V) § 158 (b)(6). Granting that Congress failed to reach all "featherbedding" practices, its enactment should not be interpreted to have no practical effect beyond requiring a change in the form of an exaction.

Accepting the result in No. 53, *American Newspaper Publishers Association* v. *Labor Board, ante,* p. 100, I think that differences in this case require a contrary result.

In both cases, the payments complained of obviously were caused by the respective unions. In both, the work performed was unwanted by the employer and its cost burdened the industry and contributed nothing to it. But here resemblance ceases. The Typographical Union is adhering to an old custom which mutual consent established and for years maintained and to which other terms of employment have long since been adjusted. In this case the union has substituted for the practice specifically condemned by the statute a new device for achieving the same result. The two cases may exemplify the same economic benefits and detriments from made work, but superfluous effort which long and voluntary usage recognized as a fair adjustment of service conditions between employer and employee in the printing industry is "exacted" for the first time in the entertainment field in order to evade the law.

That the payments involved in this case constitute a union "exaction" within the statute would seem hard to deny, whatever may be thought of the printers' case. As the Court says, the American Federation of Musicians has established a "nationwide control of professional talent." No artist or organization can perform without its approval. The respondent is in the entertainment business but can get no talent to exhibit unless it makes these payments. The "service" tendered for the payments is not wanted or useful. What the Court speaks of as "free

and fair negotiation, to determine whether such offer shall be accepted" is actually only freedom to pay or go out of business with all its attendant losses. If that does not amount to an exaction, language has lost all integrity of meaning.

But the Court holds that so long as some exertion is performed or offered by the employees, no matter how useless or unwanted, it can never be said that there is an exaction "for services which are not performed or not to be performed." This language undoubtedly presents difficulties of interpretation, but I am not persuaded that it is so meaningless and empty in practice as the Court would make it. Congress surely did not enact a prohibition whose practical application would be restricted to those without sufficient imagination to invent some "work."

Before this Act, the union was compelling the theatre to pay for no work. When this was forbidden, it sought to accomplish the same result by compelling it to pay for useless and unwanted work. This is not continuation of an old usage that long practice has incorporated into the industry but is a new expedient devised to perpetuate a union policy in the face of its congressional condemnation. Such subterfuge should not be condoned.

MR. JUSTICE CLARK, with whom THE CHIEF JUSTICE joins, dissenting.

THE CHIEF JUSTICE and I dissent on the basis of our dissenting opinion in *American Newspaper Publishers Association* v. *Labor Board, ante,* p. 100. We cannot perceive a tenable distinction between this and the printers' "featherbedding" case. To the extent of that consistency, today's majority and we are in accord. True, the employees there "work" on the keyboard of a Linotype, and here on the keys of a musical instrument. But, real-

istically viewed, one enterprise is as bogus as the other; both are boondoggles which the employer "does not want, does not need, and is not even willing to accept." The statute, moreover, does not distinguish between modern make-work gimmicks and featherbedding techniques encrusted in an industry's lore. Congress accorded no preferred position to seasoned unfair labor practices, and § 8 (b)(6) does not recognize prescriptive rights in the law. Custom and tradition can no more deprive employers than employees of statutory rights. Cf. *National Labor Relations Board* v. *Newport News Shipbuilding Co.*, 308 U. S. 241, 250–251 (1939); *Tennessee Coal, Iron & R. Co.* v. *Muscoda Local,* 321 U. S. 590, 601–602 (1944); *Jewell Ridge Coal Corp.* v. *Local No. 6167,* 325 U. S. 161, 167 (1945).