James PAPPAS, doing business as Vine Gardens, et al., Plaintiffs,

v.

AMERICAN GUILD OF VARIETY ARTISTS, an unincorporated association, et al., Defendants.

No. 53 C 1246.

United States District Court, N. D. Illinois, E. D.

Nov. 5, 1954.

Milton T. Raynor, John Moser, Stanford Clinton, and Manuel Weisman, Chicago, Ill., for plaintiffs.

Alfred Kamin, Jacobs, Kamin & Ratner, and Korshak & Rothman, Chicago, Ill., for defendants.

CAMPBELL, District Judge.

This suit is brought by individual and corporate operators of cafes and places of entertainment in the Chicago area, an association which represents them, and several individual performers, against the American Guild of Variety Artists (AGVA), its President and Administrative Secretary, and certain other guilds affiliated with AGVA. A group of booking agents were also parties plaintiff, but were dismissed by agreement. The plaintiffs seek injunctive relief under the provisions of Section 302 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C.A. § 186, which prohibits employers from making payments of any kind to representatives of their employees except under certain specified conditions. The complaint alleges that AGVA has unilaterally created a welfare fund for the benefit of its members, and has demanded that all employers of members, including the operators who are named plaintiffs, contribute to the fund; that such contributions, if made, would be unlawful under Section 302; and that when the plaintiff operators refused to contribute to the fund, AGVA employed certain economic sanctions against them, including, in four instances, a strike against their establishments. The plaintiffs seek an injunction restraining AGVA and all other defendants from making further demands for contribution to the welfare fund, and from further employing economic sanctions of any type to secure compliance to such demands.

AGVA has moved to dismiss the complaint, and submits, among other points, that the parties are not members of an industry affecting commerce, as the term is used in the Labor Management Relations Act. If that be true, this court lacks jurisdiction.

Section 302 is expressly limited to industries affecting commerce, and that term is defined in the Act as "any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce." 29 U.S.C.A. § 142(1). This language is similar to that used in the former National Labor Relations Act, 29 U.S.C.A. § 152(7), and it indicates beyond doubt that Congress intended to exercise the full sweep of its power to regulate interstate commerce. In National Labor Relations Board v. Fainblatt, 1939, 306 U.S. 601, 607, 307 U.S. 609, 59 S.Ct. 668, 672, 83 L.Ed. 1014, it was stated:

"The Act on its face thus evidences the intention of Congress to exercise whatever power is constitutionally given to it to regulate commerce * * *. Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which courts would apply the maxim *de minimis*."

Again, in Polish National Alliance of U. S. of North America v. N. L. R. B., 1944, 322 U.S. 643, 647, 64 S.Ct. 1196, 1198, 88 L.Ed. 1509, the Court stated:

"By that Act, Congress in order to protect interstate commerce from adverse effects of labor disputes has undertaken to regulate all conduct having such consequences that constitutionally it can regulate. * * *"

This view of the Act, and subsequent acts designed to regulate national labor affairs, has not been altered in the many cases which have followed Fainblatt and Polish National Alliance, and it is with this view in mind that the court turns

to the allegations of the instant complaint.

Paragraphs 17 through 21 of the complaint, which contain all references to interstate commerce, recite the following allegations:

"17. The Operators are engaged in a business affecting interstate commerce. They import or cause to be imported into the State of Illinois, goods, wares and merchandise in an amount in excess of One Million ($1,000,000.00) Dollars annually.

"18. The wrongful acts committed by the defendants against the plaintiff Operators, as alleged herein, are also being committed, or are being attempted, everywhere in the United States of America against hotels using variety entertainment, circuses, cafes, theaters employing variety artists, fairs and ice skating shows. The goods, wares, and merchandise moving in interstate commerce with respect to such places of business is substantially in excess of One Hundred Million ($100,000,000.00) Dollars annually.

"19. The wrongful acts of the defendants not only affect the Agents who are plaintiffs herein, but agents and club date bookers who are also engaged in representing variety entertainers and arranging for variety entertainment presentations throughout the United States of America.

"20. The wrongful acts committed against the Performers who are plaintiffs herein also involve all performers appearing as variety entertainers anywhere in the United States of America.

"21. In addition, these proceedings affect interstate commerce in that the performers entertain or desire to entertain on instrumentalities of commerce, such as television and radio, or appear in motion pictures, which is an industry engaged in interstate commerce."

The complaint thus alleges two distinct types of conduct which, according to plaintiffs, transform an industry which would otherwise be purely local in nature into one which affects interstate commerce. First, it is alleged that the plaintiff operators, who are engaged in the entertainment business, import large amounts of merchandise into the State of Illinois. Second, it is alleged that the entertainers who are employed by the operators, and the booking agents who represent the entertainers, perform as entertainers or serve as agents in states other than Illinois. It is doubtful that the second type of conduct is sufficient to bring the members of this segment of the entertainment industry within the scope of the Act, but the doubt need not be resolved here, for, in the opinion of the court, the first type of conduct—the importing of merchandise into Illinois—is itself an activity which might vest this court with jurisdiction under the Act. That is, if other relevant considerations were put aside, it might be decided on the basis of the allegations contained in paragraphs 17 and 18 of the complaint, that the operators are members of an industry affecting interstate commerce. cf. National Labor Relations Board v. Denver Building Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284.

## I

For the past three decades, the case of Federal Base Ball Club of Baltimore v. National League, 1922, 259 U.S. 200, 42 S.Ct. 465, 466, 66 L.Ed. 898, has controlled the many federal decisions which have underscored the intrastate nature of the entertainment industry. It was decided in the Federal Base Ball Club Case that professional baseball clubs are not amenable to suits under the Anti-Trust Acts, since baseball exhibitions are "purely state affairs." Since the decision is of paramount importance here, it is well to note the following language of the Court:

"The business is giving exhibitions of base ball, which are purely state affairs. It is true that in or-

der to attain for these exhibitions the great popularity that they have achieved, competitions must be arranged between clubs from different cities and States. But the fact that in order to give the exhibitions the Leagues must induce free persons to cross state lines and must arrange and pay for their doing so is not enough to change the character of the business. According to the distinction insisted upon in Hooper v. California, 155 U.S. 648, 655, 15 S. Ct. 207, 39 L.Ed. 297, the transport is a mere incident, not the essential thing. That to which it is incident, the exhibition, although made for money would not be called trade or commerce in the commonly accepted use of those words. As it is put by the defendant, personal effort, not related to production, is not a subject of commerce. * * *"

As could be expected, the last words quoted—"personal effort, not related to production, is not a subject of commerce" —have had a significant effect upon subsequent decisions affecting the entertainment industry. This effect may best be illustrated by a description of three decisions, each involving a separate segment of the entertainment industry. First, in Hart v. B. F. Keith Vaudeville Exchange, 2 Cir., 1926, 12 F.2d 341, 344, 47 A.L.R. 775, it was decided that persons in the vaudeville business, like the operators of baseball clubs, are not engaged in interstate commerce, as the term is used in the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note. The court there stated:

" * * * the business of acting in a theater is purely a state affair. The mere fact that the actors were obliged to cross state lines and have transportation paid, in some instances, does not change the character of the service, nor of the business."

The court also noted that the vaudeville performers carried large amounts of equipment across state lines, but considered such equipment to be merely "incidental" to the local performances.

Second, in Neugen v. Associated Chautauqua Co., 10 Cir., 1934, 70 F.2d 605, it was held that a member of a traveling circus troupe was not employed in interstate commerce, and was therefore covered by a Kansas Workman's Compensation Act, R.S.Kan.1923, 44–501 et seq. The Federal Baseball Case was controlling, since baseball exhibitions are not "essentially different" from circus exhibitions. Third, in San Carlo Opera Co. v. Conley, D.C.S.D.N.Y.1946, 72 F.Supp. 825, affirmed sub nom, Conley v. San Carlo Opera Co., 2 Cir., 1947, 163 F.2d 310, a suit brought under the Federal Arbitration Act, 9 U.S.C.A. § 1 et seq., it was held that an agreement between an operatic tenor and an opera company was not one arising out of a transaction in interstate commerce, even though the tenor would be required to travel from state to state to consummate the agreement. Here too, the Federal Baseball Case was controlling.

In 1953, the Supreme Court again decided that the business of baseball does not come within the scope of the federal anti-trust laws. Toolson v. New York Yankees, 346 U.S. 356, 74 S.Ct. 78, 79. It did so "without re-examination of the underlying issues," in the belief that "if there are evils in this field which now warrant application to it of the anti-trust laws it should be by legislation." The effect of the 1953 decision has been much the same as that of the Federal Baseball decision: its rationale has been applied to diverse segments of the entertainment and sports industries. In this circuit, for example, it was decided that professional boxing, like baseball, does not come within the scope of the anti-trust laws. Shall v. Henry, 7 Cir., 1954, 211 F.2d 226. In the Second Circuit, the District Court for the Southern District of New York recently dismissed two suits brought by the government under the anti-trust laws, the first against the owners of legitimate theaters, and the other against a professional boxing club. In the theater case, Judge Knox stated:

"In principle, I can see no valid distinction between the facts of this

case and those which were before the Supreme Court in the cases of Federal Baseball of Baltimore Club v. National League * * * and Toolson v. New York Yankees. * * * "

United States v. Shubert, D.C., 1954, 120 F.Supp. 15. The boxing case was similarly dismissed on the authority of the Supreme Court decisions in the baseball cases. United States v. International Boxing Club of New York, February 8, 1954. Appeals from both judgments by the District Court are now pending in the Supreme Court.

■■■ A review of these cases reveals that both the entertainment and sports industries, by their very nature, are not part of interstate commerce. As the Supreme Court stated in its first baseball decision: "personal effort, not related to production, is not a subject of commerce." To turn to the instant case, it is therefore a qualitative, not a quantitative analysis which leads the court to hold that the parties neither engage in nor affect commerce. That is, if the basic activity here were something other than the staging of entertainment, sufficient goods are imported by the operators into Illinois to support a finding that there is an affect upon commerce. If all the facts alleged in this complaint were true, and they are presumed to be true for purposes of this motion, the maximum *de minimis* would not be applicable. However, the basic activity of the operators and performers—the staging of entertainment—is *per se* not commerce, and, as the following discussion will show, certain incidents to the activity, such as the importation of merchandise from state to state, cannot transform the activity into one which affects commerce.

## II

When the Supreme Court last decided that professional baseball clubs were not within the scope of the anti-trust laws, the first baseball decision, then more than thirty years old, had set a course of conduct for the baseball industry. The practices complained of in 1922

were universally accepted in 1953, and many new practices seemingly violative of the anti-trust laws had developed. The issues before the Court in 1953 were therefore much the same as those presented in 1922; but the facts were certainly changed. If attention is directed to those facts which might support a finding that the professional clubs play in interstate commerce, there is no doubt that the industry considered by the Court in 1953 was far different from the one considered in 1922. See the dissenting opinion of Mr. Justice Burton, 346 U.S. at page 357, 74 S.Ct. at page 79. However, the Court refused to permit a trial of the facts, on the sole ground that Congress had not extended the coverage of the anti-trust laws despite the existence of the 1922 decision. Because Congress had not enacted appropriate legislation having a prospective effect, the Court declined to overrule its prior decision, "and, with retrospective effect, hold the legislation applicable."

■■■ In the case at bar, plaintiffs ask the court to hold that the provisions of the Labor-Management Relations Act of 1947 are applicable to members of the entertainment industry. However, so far as this court can determine, neither that Act nor the earlier National Labor Relations Act, which contains identical jurisdictional requirements, has ever before been applied to the industry. Instead, the court finds that the National Labor Relations Board (NLRB) has consistently declined to entertain complaints filed against members of any segment of this industry. A description of many NLRB decisions was furnished to the court by counsel for defendants, both during oral argument and in briefs, and need not be repeated here. Of course, these decisions are not in themselves determinative of any issue now before the court, for the NLRB, unlike the district courts, is granted a discretionary power to decline jurisdiction when, in its judgment, public policy does not demand application of the federal labor laws. See Local Union No. 12,

Progressive Mine Workers of America Dist. No. 1 v. N. L. R. B., 7 Cir., 1951, 189 F.2d 1. However, the consistent refusal of the NLRB to entertain complaints against members of the entertainment industry does bear upon the jurisdictional issue in this suit, for, presumably this settled NLRB policy was known to Congress on the many occasions it revised the labor laws. Indeed, the Act of 1947 itself represents a comprehensive revision of all federal legislation affecting labor disputes, and the NLRB had decided well before that date that it would not resolve disputes in the entertainment industry. With this policy before it, Congress decided to re-enact the jurisdictional language of the former National Labor Relations Act without alteration. In the opinion of the court this amounts to nothing less than Congressional ratification of the policy of the NLRB.

■ It is true that the complaint at bar alleges that the members of this industry import large amounts of merchandise into Illinois, and it is fiction to hold that a disruption of such activity may not affect commerce. But it is no less a fiction to hold, as the Supreme Court has held, that the professional baseball clubs of today do not compete in commerce. The controlling consideration here, as it was in the baseball case, is the long and unbroken absence of federal intervention into the affairs of this industry. In the many years during which Congress has regulated national labor affairs, so far as this court can determine, no court has ever applied federal legislation to resolve a labor dispute in the entertainment industry; and the NLRB, charged with effectuating Congressional labor policies has consistently refused to resolve any disputes in this industry. If this long period of federal inaction is to be ended now, it should be ended by Congress, not the courts.

This court therefore holds that the parties to this cause are not members of an industry affecting commerce, as the term is used in the Labor Management Relations Act of 1947, as amended. Accordingly, the defendants' motion to dismiss the complaint is granted, and the complaint is dismissed at plaintiffs' costs.