[S. F. No. 22609. In Bank. Nov. 26, 1968.]

MUSICIANS UNION, LOCAL NO. 6 et al., Petitioners, v. THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent; CHARLES O. FINLEY & COMPANY, INC., et al., Real Parties in Interest.

Neyhart, Grodin & Beeson, Joseph R. Grodin, Duane Beeson, Levy, De Roy, Geffner & Van Bourg and Victor J. Van Bourg for Petitioners.

No appearance for Respondent.

Stark, Simon & Sparrowe, Merrill J. Schwartz, Hagar, Crosby & Rosson, Raoul D. Kennedy and Paul L. May for Real Parties in Interest.

SULLIVAN, J.—Petitioners, a labor union, several of its officers, and a central labor council, seek a writ of prohibition restraining the respondent superior court from taking any further proceedings in an action for injunctive relief brought against them by real parties in interest Charles O. Finley & Company, Inc. (Finley) and the Oakland-Alameda County Coliseum, Inc. (Coliseum) and from enforcing any orders or injunctions issued in said action. Finley is the owner of the Oakland Athletics, a professional baseball team affiliated with the American League. Coliseum, a nonprofit California corporation is the lessee and operator of the Oakland-Alameda County Coliseum Complex (hereafter Coliseum Complex) which is the site of the Athletics' home games.

We first set forth the pertinent background facts. In the main action seeking an injunction Finley and Coliseum alleged in their complaint that the defendants American Federation of Musicians, Musicians' Union, Local No. 6 (Musicians Union), its named officers, and Alameda County Central Labor Council (Labor Council) all of whom are petitioners herein, threatened to interfere with the exhibition of the baseball game between the Athletics and the Baltimore Orioles on April 17, 1968, the opening day of the home season. Finley sought to hire an organist who was a member of the Musicians' Union to play at all home games, and a band of 25 union members to play at the opening game. The union denied its members permission to perform, demanding that Finley employ a union band at all weekend home games. Finley refused and the union stationed pickets at all entrances to the Coliseum site to carry signs stating, ''This Employer is Unfair to Musicians Union Local No. 6.''

The complaint further alleged that the defendants had begun, and would continue, to place pickets and distribute handbills at the entrances to the Coliseum Complex and would trespass upon the property leased by Coliseum. Allegedly, the purpose of the picketing was to coerce Finley to employ musicians at all weekend home games and to further coerce both Finley and Coliseum ''by causing the Unions representing building trades and other persons to refrain from operating and performing their trades in the Coliseum Complex.'' The result, according to the complaint, would be to substantially interfere with the exhibition of the opening baseball game. It was additionally charged that the further effect of any picketing would be to cause the plaintiffs and the public great and irreparable injury.[1]

---

[1]The complaint alleged as follows: ''That the further effect of any picketing will be to cause plaintiffs and the public great and irreparable injury in that (a) over 50,000 baseball fans have purchased tickets to attend the Athletics-Orioles professional baseball game on April 17, 1968, (b) that these patrons comprise a general cross section of the public, including elderly persons, women and children, (c) over 90% of the patrons will arrive at the game by public or private vehicular transportation, (d) that many of these patrons are unfamiliar with the Coliseum site, (e) that certain patrons of the plaintiffs and their licensees, including the parking lot attendants, special police, crowd controllers, ushers, nurses and maintenance men, may refuse to cross a picket line or work at plaintiff Coliseum, Inc.'s premises, (f) that the placing of pickets would result in interference with plaintiffs' ability to direct, manage, control and provide for the safety and welfare of the public, (g) that under the above circumstances and conditions the arrival of 50,000

After a hearing at which Finley, Coliseum, and the union appeared, respondent court issued a temporary restraining order on April 16, 1968, enjoining petitioners from "congregating, gathering, massing, demonstrating, marching, picketing, or maintaining or stationing any signs, pickets, or other persons or automobiles at the entrances of the property, or any portion thereof, described in detail in Exhibit A attached hereto and commonly known as the Coliseum Complex for any purpose relating to the hiring of musicians by Charles O. Finley & Co., Inc., or others." The order was effective until May 6, 1968, when respondent court issued a preliminary injunction to the same effect. Upon petitioner's application we issued an alternative writ of prohibition restraining all further proceedings, including the enforcement of the injunction.

We have concluded that respondent court was without jurisdiction to issue the injunction. As we explain, *infra,* under federal law the controversy is subject to the jurisdiction of the National Labor Relations Board (Board). Real parties in interest have failed to demonstrate that the Board in its discretion would decline to assert jurisdiction. Respondent has enjoined activities that are "arguably" protected or prohibited by federal law; therefore only Congress may regulate them. Moreover, the injunction cannot be justified as an exercise of the power reserved to the states to ensure public health and safety. The peremptory writ must therefore issue.[2]

The Labor Management Relations Act (Act) aims "to promote the full flow of commerce . . . and to protect the rights of the public in connection with labor disputes affecting commerce." (29 U.S.C.A. § 141.) The Board "is empowered . . . to prevent any person from engaging in any unfair labor practice . . . affecting commerce." (29 U.S.C.A. § 160(a).) "The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States. . . ."

---

patrons at the Coliseum Complex directly threatens a public calamity and risk of injury, (h) that under the circumstances, the action of the pickets will result in serious injury to the person and property of others and will seriously endanger the public peace and health."

[2]The absence of another adequate remedy was determined when we granted the alternative writ. (See *Rosemont* v. *Superior Court* (1964) 60 Cal.2d 709, 712 [36 Cal.Rptr. 439, 388 P.2d 671]; *Green* v. *Superior Court* (1961) 55 Cal.2d 403, 405 [10 Cal.Rptr. 817, 859 P.2d 249]; *City & County of San Francisco* v. *Superior Court* (1959) 53 Cal.2d 236, 243 [1 Cal.Rptr. 158, 347 P.2d 294]; *City of Los Angeles* v. *Superior Court* (1959) 51 Cal.2d 423, 429 [333 P.2d 745].)

(29 U.S.C.A. § 152(6).) "The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." (29 U.S.C.A. § 152(7); "The term 'industry affecting commerce' means any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce . . . or the free flow of commerce." (29 U.S.C.A. § 142(1).)

The Act "evidences the intention of Congress to exercise whatever power is constitutionally given to it to regulate commerce. . . ." (*N.L.R.B.* v. *Fainblatt* (1939) 306 U.S. 601, 607 [83 L.Ed. 1014, 1019, 59 S.Ct. 668].) Moreover, by "encompassing . . . all industries 'affecting commerce,' [the legislation] applies to . . . [an industry] whose business and activities are carried on wholly within a single state." (*Amalgamated Assn. of Street, Elec. Ry. & Motor Coach Employees* v. *Wisconsin Emp. Relations Board* (1951) 340 U.S. 383, 391 [95 L.Ed. 364, 374, 71 S.Ct. 359, 22 A.L.R.2d 874].)

Major league baseball teams play in eight states in the National League and in eight states and the District of Columbia in the American League. Widely distributed capital investments facilitate competition between teams constantly traveling between states. Clubs receive and expend large sums of money transmitted between states. They purchase materials in interstate commerce. Large audiences often travel across state lines to attend games. Radio and television coverage brings games, accompanied by interstate advertising of products and services, to still larger audiences beyond state lines. Major league teams are affiliated with minor league clubs comprising an organized "farm system" in several states. (See dissenting opinion of Burton, J. in *Toolson* v. *New York Yankees* (1953) 346 U.S. 356, 357-358 [98 L.Ed. 64, 68-69, 74 S.Ct. 78].) A labor dispute involving a major league baseball team can therefore affect interstate commerce and disrupt its "full flow." (29 U.S.C.A. § 141.)

█ Real parties in interest contend, however, that the activities of a major league baseball club do not constitute interstate commerce, and that the Board is therefore without jurisdiction to regulate its labor relations. They rely on *Federal Base Ball Club* v. *National League* (1922) 259 U.S. 200 [66 L.Ed. 898, 42 S.Ct. 465, 26 A.L.R. 357], in which the United States Supreme Court held that a treble-damages

action for conspiracy to monopolize the business of baseball could not be brought under the Sherman Act, on the ground that Congress could not apply federal antitrust legislation to "[t]he business [of] giving exhibitions of baseball, which are purely state affairs." (259 U.S. at p. 208 [66 L.Ed. at p. 900].)

In *Toolson* v. *New York Yankees, supra,* 346 U.S. 356, the Supreme Court reaffirmed baseball's exemption from federal antitrust regulation. The court did so, however, "without reexamination of the underlying issues" determined by *Federal Base Ball* and only insofar as "that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." (Italics added; *Toolson* v. *New York Yankees, supra,* 346 U.S. 356, 357 [98 L.Ed. 64, 69].) After extensive hearings Congress had declined to extend the coverage of antitrust laws to baseball. Thus the business developed for many years in reliance on its exemption from antitrust regulation, and although the court characterized *Federal Base Ball* as a "ruling which at best was of dubious validity," it concluded that it was for Congress to determine whether the exemption should remain. (*Radovich* v. *National Football League* (1957) 352 U.S. 445, 450 [1 L.Ed.2d 456, 461, 77 S.Ct. 390].)[3]

No such exemption created by judicial decision and nurtured by legislative acquiescence existed in professional football and boxing, however. The Supreme Court therefore applied federal antitrust laws to those sports upon the finding that they constitute interstate commerce. (*Radovich* v. *National Football League, supra,* 352 U.S. 445; *United States* v. *International Boxing Club* (1955) 348 U.S. 236 [99 L.Ed. 290, 75 S.Ct. 259].) These cases "make it clear that organized baseball is interstate commerce and Congress may therefore

---

[3]In 1951 four bills dealing with professional baseball and the antitrust laws were introduced in Congress. Hearings were held on the bills by the Subcommittee on Study of Monopoly Power of the House Committee on the Judiciary (see Hearings on Organized Baseball Before the Subcom. on the Study of Monopoly Power of the House Com. on the Judiciary, 82d Cong., 1st Sess., ser. 1, pt. 6 (1951)), but no further action was taken. Between 1951 and 1965, 60 bills dealing with the status of organized sports under the antitrust laws were introduced in Congress. Some of these bills aimed to eliminate the inconsistencies between the *Toolson* and *Radovich* cases. (H.R. Rep. No. 462, 89th Cong., 1st Sess. at 6 (1965). See e.g., Hearings on Organized Professional Team Sports Before the Antitrust Subcom. No. 5 of the House Com. on the Judiciary, 85th Cong., 1st Sess., ser. 8, pt. 1, at 1 (1957); H.R. Rep. No. 1720, 85th Cong., 2d Sess. (1958).)

regulate it." (*State* v. *Milwaukee Braves, Inc.* (1966) 31 Wis.2d 699, 720 [144 N.W.2d 1], cert. den. 385 U.S. 990 [17 L.Ed.2d 451, 87 S.Ct. 598].) We conclude that the labor dispute involving the Oakland Athletics affects interstate commerce and we detect no intent on the part of Congress to exclude baseball from its coverage under the Act. (See also *N.L.R.B.* v. *Associated Musicians* (2d Cir. 1955) 226 F.2d 900, 907, cert. den. 351 U.S. 962 [100 L.Ed.2d 1483, 76 S.Ct. 1025] ; but see *Pappas* v. *American Guild of Variety Artists* (N.D.Ill. 1954) 125 F.Supp. 343, 347; *Pennington* v. *Birmingham Baseball Club, Inc.* (1964) 277 Ala. 336, 343 [170 So.2d 410].) The Board therefore has jurisdiction over the dispute involved in the instant case.

Real parties in interest contend, however, that the Board would decline to assert jurisdiction over the dispute, and that respondent court therefore had jurisdiction in the premises. Section 14(c) of the Act provides that "(1) The Board, in its discretion, may, by rule of decision or by published rules . . . , decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction . . . (2) Nothing in this subchapter shall be deemed to prevent or bar any agency or the courts of any State . . . , from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection to assert jurisdiction." (29 U.S.C.A. § 164(c).)

Real parties in interest as the parties seeking relief in the main action have failed to sustain their burden of establishing that the Board would not hear this cause. (*Russell* v. *Electrical Workers Local 569* (1966) 64 Cal.2d 22, 23, 28-29 [48 Cal.Rptr. 702, 409 P.2d 926].)[4] They have not applied to the

---

[4]Real parties in interest argue that the rule of *Russell*—i.e., that the party seeking to invoke state court jurisdiction bears the burden of showing that the Board would decline to assert jurisdiction if application were made to it—is applicable only on direct appeal, and that in prohibition proceedings the burden shifts to the petitioner for prohibition, who must therefore show that the Board *would assert* jurisdiction. In making this contention real parties in interest rely upon *Retail Clerks' Union* v. *Superior Court* (1959) 52 Cal.2d 222 [339 P.2d 839], and *American Radio Assn.* v. *Superior Court* (1965) 237 Cal.App.2d 891 [47 Cal.Rptr. 419]. This reliance is misplaced. Those cases hold simply that prohibition will not be granted on the basis of "bare allegations of law" that the subject matter of the basic action is within the exclusive jurisdiction of the Board—such allegations being unsupported by any factual

Board for a decision of the case or for an opinion advising them whether the Board would assert jurisdiction. (29 C.F.R. §§ 101.39-101.43; 102.98-102.110.)[5] Although section 14(c) does not require prior application to the Board in every case to justify the exercise of state court jurisdiction, real parties in interest have failed to "demonstrate, on the basis of published regulations and decisions of the [B]oard, that the case is one which the [B]oard would decline to hear." (*Russell* v. *Electrical Workers Local 569, supra,* 64 Cal.2d 22, 23.)

Real parties in interest point out that the Board has never asserted jurisdiction over disputes involving professional sports teams. The Board has only twice refused to assert jurisdiction over such cases, however, and neither refusal constitutes a "rule of decision" or "published rule" that section 14(c) requires the exclusion of a class or category of employers from the Board's jurisdiction. On June 11, 1946, the Board ordered its regional office in Pittsburgh to dismiss a petition by the American Baseball Guild against the Pittsburgh Pirates, but gave no reason for its order and was careful to point out that the order did not constitute an opinion. (N.Y. Times, June 12, 1946, at p. 19, col. 6.) In 1959, the Board's Sixth Region dismissed a petition for an election by the ground crew and maintenance personnel employed by the

---

showing as to the effect of the activity upon interstate commerce. They do not hold that, in the presence of a sufficient factual showing, the burden on the issue of preemption shifts from the party seeking to invoke state court jurisdiction.

In the instant case, petitioners alleged in their petition for prohibition that "The Oakland Athletics team plays in various states throughout the United States and obtains a gross annual revenue in excess of $1,000,000"; that "No attempt has been made to invoke the jurisdiction of the National Labor Relations Board"; that "Each of the foregoing factual allegations is supported by admission or uncontradicted evidence submitted to Respondent Court"; and that "Each of the foregoing objections to the jurisdiction of Respondent Court were asserted by Petitioners in the proceedings complained of." Real parties in interest have at no time in this proceeding denied the truth of these allegations, and must therefore be deemed to have admitted the same. Therefore, in this case, unlike in the cases cited by real parties in interest, the parties seeking prohibition have made a sufficient factual showing as to the effect of the activity in question upon interstate commerce, and prohibition will issue unless real parties in interest can successfully bear the burden of showing "on the basis of published regulations and decision of the [B]oard, that the case is one which the [B]oard would decline to hear." (*Russell* v. *Electrical Workers Local 569, supra,* 64 Cal.2d 22, 23.)

[5]In *Russell* we issued the following *caveat*: "Prudent counsel, contemplating the fact that the plaintiff bears the burden of persuading the state court that the board would decline to proceed, might be well advised to secure such opinions in cases raising close issues as to the exercise of board jurisdiction." (64 Cal.2d at p. 26.)

Pittsburgh Athletic Co., on the ground that to assert its jurisdiction "would not effectuate the purposes" of the Act. (*Pittsburgh Athletic Co.* (1959) 44 L.R.R.M. 1274, 1275.) Again, the Board issued no opinion.

It is true that the Board has on some occasions declined to assert jurisdiction over segments of the sports and entertainment industries. (E.g., *Olympia Stadium Corp.* (1949) 85 N.L.R.B. 389 (sports arena); *Philadelphia Orchestra Assn.* (1951) 97 N.L.R.B. 548 (symphony orchestra); *Walter A. Kelley* (1962) 139 N.L.R.B. 744 (horse racing); see *Pappas* v. *American Guild of Variety Artists, supra,* 125 F.Supp. 343, 347; *New Orleans Opera Guild, Inc.* v. *Local 174, Musicians etc. Union* (1961) 242 La. 134 [134 So.2d 901, 906].) The Board, however, "has not created any special standard" to decline jurisdiction over all cases involving these industries. (Krasnow & Levy, *Unionization and Professional Sports* (1963) 51 Georgetown L.J. 749, 777-778.) Thus it has declined to assert jurisdiction over horse racing on the ground that the industry is subject to extensive and detailed regulation by the states. (*Walter A. Kelley, supra,* 139 N.L.R.B. 744, 747.) Moreover, if an employer's operations "have a close, intimate, and substantial relation to trade, traffic, and commerce among the states . . . ," the Board has exercised jurisdiction without pausing to determine whether the employer's business "is to be classified as a sports industry or one more in the nature of amusement or entertainment. . . ." (*Aspen Skiing Corp.* (1963) 143 N.L.R.B. 707, 708.) Indeed, the Board has recognized that "the amusement or entertainment industry, although once regarded as being out of the main stream of commerce, is no longer a negligible factor in our national life." (*Ray, Davidson & Ray* (1961) 131 N.L.R.B. 433, 435.) It has asserted jurisdiction, for example, over sports centers (*Celebrity Sports Center* (1968) 169 N.L.R.B. No. 29), skiing facilities (*Aspen Skiing Corp., supra,* 143 N.L.R.B. 707), gambling casinos (*Harrah's Club* (1965) 150 N.L.R.B. 1702, enforced (9th Cir. 1966) 362 F.2d 425, cert. den. 386 U.S. 915 [17 L.Ed.2d 788, 87 S.Ct. 859]), and theatres (*The League of New York Theatres, Inc.* (1961) 129 N.L.R.B. 1429). We must, therefore, conclude that real parties in interest have failed to demonstrate that the Board would not assert jurisdiction over a case involving a professional baseball team.

Section 7 of the Act provides that "Employees shall have the right . . . to engage in . . . concerted activities for the

purpose of . . . mutual aid or protection. . . .'' (29 U.S.C.A. § 157.) Section 8 defines activities that constitute unfair labor practices. (29 U.S.C.A. § 158.) ''When an activity is arguably subject to [section] 7 or [section] 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the [Board] if the danger of state interference with national policy is to be averted.'' (*San Diego Bldg. Trades Council* v. *Garmon* (1959) 359 U.S. 236, 245 [3 L.Ed.2d 775, 783, 79 S.Ct. 773].) We have concluded that the Act ''arguably'' protects or prohibits the activities enjoined in the present case, and that respondent court was therefore without jurisdiction to enjoin them.[6] (See *Garner* v. *Teamsters Union* (1953) 346 U.S. 485, 500 [98 L.Ed. 228, 244-245, 74 S.Ct. 161]; *Weber* v. *Anheuser-Busch, Inc.* (1955) 348 U.S. 468, 481 [99 L.Ed. 546, 558, 75 S.Ct. 480]; *Construction Laborers* v. *Curry* (1963) 371 U.S. 542, 546 [9 L.Ed.2d 514, 517-518, 83 S.Ct. 531]; *Liner* v. *Jafco, Inc.* (1964) 375 U.S. 301, 309 [11 L.Ed.2d 347, 353, 84 S.Ct. 391].)

Petitioners' picketing for the purpose of obtaining employment by Finley of a union band at all weekend home games ''arguably'' constitutes ''concerted activities for the purpose of . . . mutual aid or protection, . . .'' within the meaning of section 7. (29 U.S.C.A. § 157.) ''For generations professional musicians have faced a shortage in the local employment needed to yield them a livelihood. They have been confronted with the competition of military bands, traveling bands, foreign musicians on tour, local amateur organizations and, more recently, technological developments in reproduction and broadcasting.'' (*N.L.R.B.* v. *Gamble Enterprises* (1953) 345 U.S. 117, 119 [97 L.Ed. 864, 867-868, 73 S.Ct. 560].) Mr. Finley testified, for example, that he wished to have the University of California band perform at the opening game, and that a recording of the national anthem was sufficient for his purposes. Petitioner Spain, vice president of the union, testified that several professional sports teams in

---

[6]This conclusion has been reached in light of interpretive guidelines announced by this court in *Grunwald-Marx, Inc.* v. *Los Angeles Joint Board* (1959) 52 Cal.2d 568 at p. 584 [343 P.2d 23]: ''[C]ertainly by using the term 'arguably' Mr. Justice Frankfurter [in *Garmon*] did not mean to imply that a litigant can cause a state court to lose jurisdiction merely by the assertion that the particular activity is either protected by section 7 or prohibited by section 8. He must have meant 'susceptible of reasonable argument.' ''

Oakland and San Francisco, including the San Francisco Giants baseball team, have obtained the services of union musicians on a regular basis. By seeking to broaden the employment opportunities for its members, therefore, the union pursued an objective that section 7 "arguably" protects as an activity for the employees' "mutual aid or protection."

Nor does section 8(b)(6), the so-called "anti-featherbedding" provision, prohibit such activity. That section provides that it is an unfair labor practice for a labor organization "to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed and not to be performed, . . ." (29 U.S.C.A. § 158(b)(6).) ▪ Although the employer may neither want nor need the services that the union offers, the union's insistence that he accept them does not violate section 8(b) (6). (*American Newspaper Publishers Assn.* v. *N.L.R.B.* (1953) 345 U.S. 100, 110 [97 L.Ed. 852, 860-861, 73 S.Ct. 552, 31 A.L.R.2d 497]; *N.L.R.B.* v. *Gamble Enterprises, supra,* 345 U.S. 117, 123-124 [97 L.Ed. 864, 869-870] (". . . when an employer receives a bona fide offer of competent performance of relevant services, it remains for the employer, through free and fair negotiation, to determine whether such offer shall be accepted and what compensation shall be paid for the work done.").)

▪ Moreover, picketing for employees' "mutual aid or protection" is a classic form of "concerted activities" within the meaning of section 7. The Act prescribes a detailed procedure for restraint of types of picketing specified in section 8. Such prescription "would seem to imply that other picketing is to be free of other methods and sources of restraint. ▪ For the policy of the [Act] is not to condemn all picketing but only that ascertained by its prescribed processes to fall within its prohibitions. Otherwise, it is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing. For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits." (*Garner* v. *Teamsters Union, supra,* 346 U.S. 485, 499-500 [98 L.Ed. 228, 244-245]; see also *N.L.R.B.* v. *Fruits & Vegetable Packers & Warehouse-*

*men* (1964) 377 U.S. 58, 70 [12 L.Ed.2d 129, 137-138, 84 S.Ct. 1063]; *N.L.R.B.* v. *Washington Aluminum Co.* (1962) 370 U.S. 9, 17 [8 L.Ed.2d 298, 304, 82 S.Ct. 1099] ("The activities engaged in here do not fall within the normal categories of unprotected concerted activities such as those that are unlawful, violent or in breach of contract.").)[7]

The fact that the pickets in the present case were not employees of Finley in no way dilutes the protection afforded by section 7. "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, . . ." (29 U.S.C.A. § 152(3); see *Waxman* v. *Virginia* (1962) 371 U.S. 4 [9 L.Ed.2d 50, 83 S.Ct 46], revg. 203 Va. 257 [123 S.E.2d 381]; *N.L.R.B.* v. *Babcock & Wilcox*

---

[7]At oral argument real parties in interest raised for the first time a contention which we understand as follows: Although the activities of the union here in question are not arguably prohibited under section 8(b)(6) of the Act (*American Newspaper Publishers Assn.* v. *N.L.R.B.*, *supra*, 345 U.S. 100, 110 [97 L.Ed. 852, 860]; *N.L.R.B.* v. *Gamble Enterprises*, *supra*, 345 U.S. 117, 123-124 [97 L.Ed. 864, 869-870]), neither are they arguably protected under section 7—for the reason that such activities constitute a violation of the Hobbs Anti-Racketeering Act (18 U.S.C.A. § 1951) which renders liable to criminal sanctions anyone who ". . . obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or conspires so to do, . . ." Since violations of the Hobbs Act are not protected activity under Taft-Hartley (see *United States* v. *Green* (1956) 350 U.S. 415, 419-420 [100 L.Ed. 494, 499-500, 76 S.Ct. 522]), it is therefore urged that there is no "arguable" Taft-Hartley protection in this case, and therefore no preemption.

The difficulty with this contention is that we neither have been directed to nor have been able to find any case wherein activity even remotely related to that here in question has been held in violation of the Hobbs Act. *United States* v. *Green*, *supra*, 350 U.S. 415, cited to us by real parties in interest, involved threats of force and violence made by the union and its representatives. In *United States* v. *Provenzano* (3d Cir. 1964) 334 F.2d 678, cert. den. 379 U.S. 947 [13 L.Ed.2d 544, 85 S.Ct. 940], also cited to us by real parties in interest, cash payments were extorted from an employer by a labor union officer in order to ensure the cooperation of employees with the employer. Again, in *United States* v. *Kramer* (7th Cir. 1966) 355 F.2d 891, cert. granted in part and denied in part 384 U.S. 100 [16 L.Ed.2d 396, 86 S.Ct. 1366], also cited to us, cash payments were extorted from an employer by a labor official and another person in order to ensure that efficient rather than inefficient employees would be provided to the employer. In no case has it been held or intimated that peaceful picketing activities in order to secure employment for union members is a violation of the Hobbs Act. ". . . [I]t was not the intention of the Congress [in enacting the Hobbs Act] to interfere with the exertion of peaceful economic pressures by a union through the medium of strikes to achieve legitimate labor objectives." (*United States* v. *Varlack* (2d Cir. 1955) 225 F.2d 665, 669; see also *Callanan* v. *United States* (8th Cir. 1955) 223 F.2d 171, 175, cert. den. 350 U.S. 862 [100 L.Ed. 764, 76 S.Ct. 102]; *Bianchi* v. *United States* (8th Cir. 1955) 219 F.2d 182, 190, cert. den. 349 U.S. 915 [99 L.Ed. 1249, 75 S.Ct. 604].) Neither do we think it was the intention of Congress to render criminal the activities concerned in the instant case.

*Co.* (1956) 351 U.S. 105, 111-113 [100 L.Ed. 975, 982-983, 76 S.Ct. 697] ; *Marshall Field & Co.* v. *N.L.R.B.* (7th Cir. 1952) 200 F.2d 375, 379-380.) Moreover, '' [t]he term 'labor dispute' includes any controversy concerning terms, tenure or condi- tions of employment, or concerning the association or repre- sentation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employ- ment, regardless of whether the disputants stand in the proxi- mate relation of employer and employee.'' (29 U.S.C.A. § 152(9) ; see *Aetna Freight Lines, Inc.* v. *Clayton* (2d Cir. 1955) 228 F.2d 384, 388, cert. den. 351 U.S. 950 [100 L.Ed. 1474, 76 S.Ct. 846] (''Peaceful *stranger picketing* by a labor organization in the course of a labor dispute is . . . an activity subject to injunction only through the procedures authorized in the Act, and, if not so condemned, is protected by Congress against injunctive prohibition arising outside the Act.'' (Italics added.).) Since the circumstances of the present case at least ''arguably'' constitute a labor dispute involving violation of section 7 rights by the employer, the trial court ''had no jurisdiction to issue an injunction or to adjudicate the controversy. . . .'' (*Construction Laborers* v. *Curry, supra,* 371 U.S. 542, 546-547 [9 L.Ed.2d 514, 517-518] ; *Liner* v. *Jafco, Inc., supra,* 375 U.S. 301, 309-310 [11 L.Ed.2d 347, 353].)

 Moreover, petitioner's activities in the present case ''arguably'' constitute an unfair labor practice prohibited by section 8(b)(4)(i)(B) of the Act. That section makes it unlawful for a labor organization ''. . . to induce or encour- age any individual employed by any person engaged in com- merce or in an industry affecting commerce to engage in . . . a refusal in the course of his employment . . . to per- form any services . . . where . . . an object thereof is . . . forcing or requiring any person . . . to cease doing business with any other person, . . .'' (29 U.S.C.A. § 158(b)(4)(i) (B).)

The complaint upon which the injunction was issued alleged that employees performing services at the Coliseum Complex refused to cross petitioner's picket lines, and that employees of Coliseum might refuse to cross those lines on the opening game. Thus the picketing might well have induced employees of Coliseum, the secondary employer with whom petitioners had no dispute, to refuse to perform services.
 Whether Coliseum is engaged in commerce or in an

industry affecting commerce would not necessarily control the Board's jurisdiction over secondary picketing, for such jurisdiction "may be satisfied by reference to the business operations of either the primary [Finley and the Oakland Athletics] or the secondary employer." (*Hattiesburg Unions* v. *Broome Co.* (1964) 377 U.S. 126 [12 L.Ed.2d 172, 84 S.Ct. 1156].) ▇ Although both employers had their offices at the Coliseum Complex, petitioners arguably failed to comply with one of the Board's conditions for lawful picketing of such a common situs by failing to carry signs identifying Finley clearly as the employer who was the target of the picketing. (*Sailor's Union of The Pacific (Moore Dry Dock)* (1950) 92 N.L.R.B. 547, 549-551; *Los Angeles Bldg. & Constr. Trades Council* (1965) 150 N.L.R.B. 1590, 1591; *Superior Derrick Corp.* v. *N.L.R.B.* (5th Cir. 1960) 273 F.2d 891, 895, cert. den. sub. nom. *Seafarers' Intl. Union of North America, AFL-CIO* v. *N.L.R.B.*, 364 U.S. 816 [5 L.Ed.2d 47, 81 S.Ct. 47].) ▇ Moreover, petitioners' purpose "arguably" was to force Coliseum to cease doing business with Finley in violation of the Act. Since it is for the Board to determine whether such was indeed petitioners' purpose, we must conclude that respondent was without jurisdiction to enjoin the activities in question.

▇ Additionally, real parties in interest have failed to justify the injunction as an exercise of the power reserved to the states to prevent "mass picketing, threatening employees desiring to work with physical injury or property damage, obstructing entrance to and egress from the company's factory, obstructing the streets and public roads surrounding the factory, and picketing the homes of employees." (*Allen-Bradley Local No. 1111* v. *Wisconsin Emp. Relations Board* (1942) 315 U.S. 740, 748 [86 L.Ed. 1154, 1164, 62 S.Ct. 820]; see *Youngdahl* v. *Rainfair, Inc.* (1957) 355 U.S. 131, 139 [2 L.Ed.2d 151, 157, 78 S.Ct. 206]; *San Diego Bldg. Trades Council* v. *Garmon, supra,* 359 U.S. 236, 247 [3 L.Ed.2d 775, 784].) The fact that holding the game in the face of the picketing might pose a threat to public safety and order does not convert peaceful picketing that the state may not enjoin into "the kind of mass picketing and overt threats of violence which under the *Allen-Bradley* case give the state court jurisdiction." (*Weber* v. *Anheuser-Busch, Inc., supra,* 348 U.S. 468, 482 [99 L.Ed. 546, 558].) The picketing, peaceful in itself, would have caused the ensuing turmoil no more than

Finley's decision to hold the game would have. It was for the Board, therefore, to regulate the economic struggle between Finley and petitioners. Even if respondent court had jurisdiction to ensure public order at the game, its injunction prohibiting all picketing at all times and all entrances was overly broad to accomplish that purpose and therefore impinged on the Board's exclusive competence to regulate picketing that does not threaten public disorder. (See *Youngdahl* v. *Rainfair, Inc., supra,* 355 U.S. 131, 139 [2 L.Ed.2d 151, 157] ; *Weber* v. *Anheuser-Busch, Inc., supra,* 384 U.S. 468, 482 [99 L.Ed. 546, 558].)

Real parties in interest contend that respondent court had jurisdiction to enjoin petitioners from trespassing upon property held by Coliseum as lessee from the City of Oakland and the County of Alameda. In *Amalgamated Meat Cutters etc. Workmen* v. *Fairlawn Meats* (1957) 353 U.S. 20 [1 L.Ed.2d 613, 77 S.Ct. 604], the Supreme Court determined that picketing for the purpose of compelling an employer to enter into a union-shop contract was "arguably" prohibited by section 8(b) (2), and the state was therefore without jurisdiction to enjoin the picketing. Vacating an injunction that prohibited, inter alia, trespassing upon the employer's property, the court said, "Whether a State may frame and enforce an injunction aimed narrowly at a trespass of this sort is a question that is not here. Here the unitary judgment of the Ohio court was based on the erroneous premise that it had power to reach the union's conduct in its entirety. Whether its conclusion as to the mere act of trespass would have been the same outside of the context of petitioner's other conduct we cannot know." (353 U.S. at pp. 24-25 [1 L.Ed.2d at p. 616].)

 The Supreme Court has not specifically answered the question left open in *Fairlawn Meats.* It has never authorized the states, however, to prohibit peaceful picketing that the Act regulates. Moreover, it is clear that a blanket application of the states' trespass laws to prohibit such picketing "would tend to frustrate uniform application of federal labor legislation." (Note (1960) 73 Harv.L.Rev. 1216, 1219.) Unlike the power to prevent violence and public disorder, the power to prohibit peaceful picketing that trespasses on the premises of employers involved in labor disputes would "leave the States free to regulate conduct so plainly within the central aim of federal regulation. . . ." (*San Diego Bldg. Trades Council*

v. *Garmon, supra,* 359 U.S. at p. 244 [3 L.Ed.2d at p. 782].) The law of trespass, any more than the law of restraint of trade (*Weber* v. *Anheuser-Busch, supra,* 348 U.S. 468), cannot frustrate the federal scheme. (See Note, *Shopping Centers and Labor Relations Law* (1958) 10 Stan.L.Rev. 694, 706-709.)

There may be circumstances in which the use of trespass laws in labor controversies would reach activities that would have "no relevance to the Board's function," and the state's power to enjoin them "would not interfere with the Board's jurisdiction over the merits of the labor controversy." (*Linn* v. *Plant Guard Workers* (1966) 383 U.S. 53, 63-64 [15 L.Ed.2d 582, 590-591, 86 S.Ct. 657].) ▮ In the present case, however, the injunction relies upon the law of trespass not to ensure public safety and order, but to institute ground rules governing the economic struggle between the union and real parties in interest. It does not prohibit trespassing in specified times and places to guarantee the orderly exhibition of the game. Thus the injunction protects not the public welfare, but the private right of Coliseum to post its property against any designated entrant thereon. It is for the Board, however, to determine whether and how to protect a party against activities that the Act "arguably" protects or prohibits. Indeed, the propriety of labor activity on private property has been a persistent issue in disputes before the Board (See Note, *supra,* 73 Harv.L.Rev. 1216, 1218), and the Board has the power in appropriate cases to authorize such activity. (See *Marshall Field & Co.* v. *N.L.R.B., supra,* 200 F.2d 375, 380; *N.L.R.B.* v. *Babcock & Wilcox Co., supra,* 351 U.S. 105, 111-112 [100 L.Ed. 975, 982-983].) ▮ Consequently it is manifest that petitioners' trespass upon Coliseum's property does not justify respondent court's exercise of its jurisdiction to prohibit peaceful activities "arguably" protected or prohibited by federal law.[8]

For the foregoing reasons we have concluded that respondent superior court did not have jurisdiction to enjoin petitioners' activities. The relief prayed for must therefore be granted.

---

[8]*Accord: Your Food Stores of Santa Fe* v. *Retail Clerks, Local 1564* (D.C.N.M. 1954) 121 F.Supp. 339, affd. (10th Cir. 1955) 225 F.2d 659; *State* v. *Williams* (Balt. Crim. Ct. Md. 1959) 44 L.R.R.M. 2357, 2363; *Freeman* v. *Retail Clerks Union* (1961) 58 Wn.2d 426, 428 [363 P.2d 803]. *Contra: Moreland Corp.* v. *Retail Store Employees Union* (1962) 16 Wis.2d 499, 503 [114 N.W.2d 876]; *People* v. *Goduto* (1961) 21 Ill.2d 605 [174 P.2d 385], cert. den. 368 U.S. 927 [7 L.Ed.2d 190, 82 S.Ct. 361].

Let a peremptory writ of prohibition issue restraining all further proceedings in Charles O. Finley & Co., Inc., et al. v. American Federation of Musicians, et al., Alameda Superior Court No. 378872, including the enforcement of any orders or injunctions heretofore issued in said action.

Traynor, C. J., Peters, J., Mosk, J., Burke, J., and Peek, J.,* concurred.

McCOMB, J.—I dissent. I would deny the writ.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.